UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COUNTY OF BARNSTABLE, MASSACHUSETTS, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:17-cv-40002-DJC |
| | ) ) | DEMAND FOR JURY TRIAL |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); ANGUS FIRE; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD; NATIONAL FOAM, INC.; TYCO FIRE PRODUCTS L.P. (successor - in-interest to the Ansul Co.); JOHN DOE DEFENDANTS 1-49, | ) ) ) ) ) ) ) ) | **Leave to file granted on February 8, 2018** |
| Defendants. | | |

## FIRST AMENDED COMPLAINT

### I.     INTRODUCTION

1.      Plaintiff, County of Barnstable, Massachusetts, and pursuant to this Court's December 18, 2017 order [ECF No. 109], amends this action to recover the costs necessary to protect the public health, safety, welfare and the environment, comply with applicable soil and groundwater cleanup standards, and prevent the contamination of drinking water resources by restoring the groundwater quality and eliminating contamination caused and/or created by Defendants' products.  Plaintiff also seeks indemnification in connection with legal claims brought against Plaintiff by the Town of Barnstable, Massachusetts arising out of the contamination of the Town of Barnstable's drinking water supply caused and/or created by Defendants' products.

2.      Through this action, Plaintiff seeks compensatory damages and contribution for the damage to its property, for the costs to investigate, remediate, and monitor PFOS and PFOA contamination on its property and in the groundwater affected by the use of AFFF on its

property, and reasonable attorneys' fees and costs for itself as well as indemnification costs associated with the Town's legal claim against Plaintiff.

## II.    PARTIES

3.    Plaintiff, County of Barnstable, Massachusetts ("County" or "Plaintiff"), is a duly incorporated body politic and corporate under the laws of the Commonwealth of Massachusetts, with its primary address at 3195 Main Street, Barnstable, Massachusetts 02630. Barnstable County has a population of approximately 215,000 and includes the Cape Cod Towns of Bourne, Brewster, Chatham, Dennis, Eastham, Falmouth, Harwich, Mashpee, Orleans, Provincetown, Sandwich, Truro, Wellfleet and Yarmouth. The County owns approximately five acres of land located off Mary Dunn Road in Barnstable, Massachusetts ("Property") on which the Barnstable County Fire Training Academy ("Fire Academy") operates.

4.    Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

5.    Beginning before 1970 and until at least 2002, 3M manufactured, distributed and sold AFFF containing PFOS. 3M was the only company that manufactured or sold AFFF containing PFOS.

6.    Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor in interest of The Ansul Company ("Ansul"), having

acquired Ansul in 1990. (Ansul and Tyco (as the successor in interest to Ansul), will hereinafter be collectively referred to as "Tyco/Ansul.")

7.      Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA.  After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained fluorocarbon surfactants containing PFOA.

8.      Tyco/Ansul manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at Plaintiff's Fire Academy.

9.      Defendant Angus Fire ("Angus") has its corporate headquarters in Bentham, North Yorkshire, United Kingdom.  Angus' head office in the United States is located at 141 Junny Rd., Angier, North Carolina 27501.

10.     Beginning in or around 1994, Angus began manufacturing AFFF that contained PFOA.

11.     Angus manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at Plaintiff's Fire Academy.

12.     Defendant Chemguard is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinetter, Wisconsin 54143.

13.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

14.     Chemguard manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at Plaintiff's Fire Academy.

15.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

16.     Beginning in or around 2004, Buckeye manufactured, distributed and/or sold AFFF containing PFOA.  Buckeye's AFFF was used at Plaintiff's Fire Academy.

17.     Defendant National Foam, Inc. (a/k/a Chubb National Foam) (collectively "National Foam") is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

18.     Beginning in or around 1976, National Foam manufactured, distributed and sold AFFF containing PFOA.  National Foam's AFFF was used at Plaintiff's Fire Academy.

19.     Upon information and belief, Defendant John Does 1-49 were manufacturers, distributors or sellers of AFFF.  Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the County will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

### III.     JURISDICTION AND VENUE

20.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

21.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PFOS and PFOA

22.    PFOS and PFOA fall within a class of chemicals known as perfluoroalkyl substances ("PFASs").

23.    PFASs have been used in the manufacture of, among other things, carpets, clothing, fabrics for furniture, packaging for food and other materials such as cookware that are resistant to water, grease or stains (a/k/a Teflon).  PFOS and PFOA are also found in AFFF and are used in a number of industrial processes.

24.    PFOS and PFOA are characterized by a carbon-fluorine ("C-F") bond that is one of the strongest chemical bonds that occur in nature.

25.    PFOS and PFOA are extremely stable and resistant to metabolic and environmental degradation.

26.    PFOS and PFOA are extremely persistent in the environment and in the human body, and have the potential to bioaccumulate and biomagnify in wildlife.

27.    Bioaccumulation appears to be related to the length of the C-F chain.  As the size of the chain increases the compound becomes more bioaccumulative.

28.    PFOS and PFOA degrade very slowly, if at all, in groundwater.  PFOS and PFOA are water soluble and can migrate readily from soil to groundwater, where they can be transported long distances.

29.    PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

30.    Typical municipal water treatment plants do not have the capability to  filter or treat PFOS and PFOA.

31.     PFOS and PFOA can cross the placenta from mother to fetus and can be passed to infants through breast milk.

32.     According to the Massachusetts Department of Environmental Protection, exposure to PFOA and PFOS above certain concentrations may result in certain health effects including, but not limited to:

    a.     kidney cancer;

    b.     testicular cancer;

    c.     developmental effects to fetuses during pregnancy or to breastfed infants;

    d.     liver effects;

    e.     immune effects, and;

    f.     thyroid effects.

33.     Under the U.S. Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is Suggestive Evidence of Carcinogenic Potential of PFOS and PFOA in humans.

34.     The International Agency for Research on Cancer has concluded that PFOA is possibly carcinogenic to humans.

35.     AFFF that contained PFASs, or contained precursors to PFASs, was developed in the 1960s as an alternative to existing protein-based firefighting foams.

36.     In the early 1960's, 3M and the United States Naval Research Laboratory developed AFFF to extinguish jet fuel fires, which are largely impervious to water, by smothering them.  3M's AFFF, which is produced through a 3M process called electrochemical fluorination, contained PFOS.

37.     3M is the only manufacturer who used the electrochemical fluorination process, and therefore, produced the only AFFF that contained PFOS, as opposed to PFOA.

38.     Therefore, if PFOS is identified at a site where AFFF was used, the AFFF is a 3M product.  Other formulations of AFFF manufactured by the non-3M Defendants are synthesized through telomerization and contain PFOA, but not PFOS.

39.     In 1967, the Department of Defense ("DoD") first issued military specification Mil-F-24385 ("Mil Spec"), which included the DoD's requirements for AFFF liquid concentrate fire extinguishing agents.  The Mil Spec covered "the requirements for [AFFF] liquid concentrate fire extinguishing agent consisting of fluorocarbon surfactants and foam stabilizers."

40.     The Mil Spec does not include any requirements regarding the chemical characteristics of the "fluorocarbon surfactants" in Mil Spec compliant AFFF.

41.     Upon information and belief, instructions, labels and material safety data sheets were provided with the AFFF by Defendants, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Defendants knew or should have known.

42.     Upon information and belief, Defendants had known of these health and environmental hazards for years.

43.     Throughout the 1950s, 3M's own internal animal studies consistently concluded that PFASs are "toxic."

44.     A 1956 study at Stanford University concluded that PFASs manufactured by 3M bind to proteins in blood.

45.     3M knew as early as the mid-1950s that PFASs accumulate in humans and animals.

46.     By the early 1960s, 3M understood that PFASs are stable and persist in the environment and that they do not degrade.

47.     According to a deposition transcript from a pending lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for damages to the state's natural resources from PFASs, 3M began monitoring the blood of its employees for PFASs, as early as 1976, because the company was "concerned" about "health" effects of PFASs.  3M documents from 1977 relating to these worker tests further confirmed that PFASs bioaccumulate.

48.     A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

49.     Studies undertaken by 3M in the 1970s demonstrated that PFASs were even "more toxic than was previously believed."

50.     A technical journal in 1970 observed after conducting tests on a 3M product containing PFASs that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

51.     In 1979, a 3M scientist recognized in Interoffice Correspondence that PFASs posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

52.     According to the Minnesota Attorney General's allegations in the Minn. Lawsuit, despite 3M's understanding of the risks associated with PFASs, 3M engaged in a campaign to distort scientific research concerning PFASs and to suppress research into the potential harms associated with PFASs.

53.     According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFASs, 3M would be forced to halt its manufacturing of PFASs and PFAS-derived products that would result

in the loss of hundreds of millions of dollars in annual revenue.

54.    The potential loss of 3M's massive profits from PFASs drove 3M to engage in a campaign to influence the science relating to PFASs and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

55.    A key priority of an internal 3M committee—referred to as the FC Core Team— was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFASs and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

56.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFASs and sought control over when and whether the results of scientific studies were published at all.

57.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy.  3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript from the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

58.    According to Professor Giesy's deposition transcript from in Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

59.    According to Professor Giesy's emails produced in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and in performing reviews of these articles, Professor Giesy stated that he was always careful to

ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFASs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

60.     According to Professor Giesy's deposition transcript from the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFASs.

61.     Defendants marketed and promoted its AFFF products with the assistance of industry funded trade groups including, but not limited to, the Fire Fighting Foam Coalition.

62.     Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of PFOS and PFOA, in part, because of the chemicals' biopersistence.

63.     3M, who was the predominant manufacturer of AFFF, ceased production of PFOS-based AFFF in 2002.

64.     An EPA internal memo on the day of 3M's phase-out announcement in 2002 stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. . . . *[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree*." (emphasis added).

65.     On May 25, 2016, EPA issued a Notice of its revised lifetime health advisory for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion) for PFOS and PFOA. Because these two chemicals cause similar types of adverse health effects, EPA recommends that

when both PFOS and PFOA are found in drinking water the combined concentrations of PFOS and PFOA be compared with the 0.07 part per billion HA level."

**B.    The Fire Academy Property ("Property")**

66.    Upon information and belief, Enoch T. Cobb was the owner of approximately one hundred acres of land in and around the Town of Barnstable.  When he died in or around February of 1876, he bequeathed that property to the Enoch T. Cobb Trust ("Trust") to be held for the benefit of the Town of Barnstable.

67.    The Town of Barnstable is comprised of seven villages, with Hyannis being the largest village.

68.    On or around June 1, 1956, the Town leased the Property to Barnstable County Fire Training School, Inc. for a term of twenty-five years ("1956 Lease").  The 1956 lease required that the Property be used and improved for purposes only for which Barnstable County Fire Training School, Inc. was incorporated.

69.    The purpose for which the Barnstable County Fire Training School, Inc. was formed was "to procure land, structures and services to provide training for members of Fire Departments in Towns and Fire Districts in Barnstable County in methods and manner of combatting, controlling and extinguishing fires, the aftermath of explosions, resuscitation and the saving of lives; by lectures demonstrations and experiments ...."

70.    Pursuant to a vote of the Town taken under Articles 1 and 2 of the Warrant of a Special Meeting on December 11, 1958, on or around December 12, 1958, the Town leased the Property to the County for a term of ten years, with the County having the right to renew the lease for four successive ten-year terms at the expiration of the ten-year lease term ("1958

Lease"). Pursuant to the 1958 Lease, the Town required the land "shall only be used for fire training purposes."

71.    Pursuant to a vote of the Town taken under Article 30 of the Warrant of a Special Town Meeting held on October 23, 1969, the Town leased the Property to the County for a term of fifty years ("1969 Lease"). The 1969 Lease specified that the Property shall only be used for police and fire training purposes, and with the restriction that if the County determined the Property shall no longer be used for police and fire training purposes, all rights and obligations under the lease would terminate.

72.    In 1982, the Probate Court in Barnstable County issued an Equity Judgment that the Trust sell and convey the Property to the County.

73.    In May of 1983, the County purchased the Property from the Trust.

74.    Since 1956, the Property has been improved with buildings, classrooms and offices, burn structures and "props" for the purpose of providing fire training activities.

75.    Since 1956, fire fighters, fire brigades, private industry fire departments and fire districts from Cape Cod and elsewhere have received training at the Property on the use of firefighting equipment, apparatus, including self-contained breathing apparatus, engines, ladders, and in firefighting techniques with use of live fires, and in the use and application of AFFF that was manufactured and/or sold by the Defendants. AFFF use was discontinued on the Property in or about 2009.

76.    From 1956 until approximately February of 1988, firefighting training at the Property was under the control, management and direction of the Barnstable County Fire Chief Association, Inc., f/k/a the Barnstable County Fire Training School, Inc., and/or personnel from the Hyannis Fire District.

77.     The Hyannis Fire District was established in 1896 and is the oldest of the five fire districts in the Town of Barnstable.

78.     Upon information and belief, the Hyannis Fire District, which services the Town of Barnstable, conducted trainings at the Property, which included training in the use and application of Defendants' AFFF containing PFOS and/or PFOA.

79.     At all times in which AFFF training exercises were conducted at the Property, other parties, including but not limited to the Hyannis Fire District, brought AFFF to the Property.

80.     At no time did the County purchase, acquire, own, obtain, or otherwise bring to, use or dispose of AFFF at the Property.

81.     The AFFF manufactured by Defendants contained the fluorinated surfactants PFOS (perfluorooctanesulfonic acid) and/or PFOA (perfluorooctanoic acid) and/or contain the precursors of PFOS and PFOA.

82.     Defendants knew or should have known that PFOS and PFOA are persistent when released into the environment and present significant risks to human health and the environment.

83.     Nevertheless, Defendants marketed and sold AFFF with the knowledge that PFOS and/or PFOA would be released into the environment in firefighting training exercises and in firefighting emergencies.

84.     Defendants marketed and sold AFFF to the Town of Barnstable ("Town") through various fire districts, including but not limited to the Hyannis Fire District, and to other Fire Departments within Barnstable County with the knowledge that the use of AFFF containing PFOS and/or PFOA would be released into the environment during firefighting training exercises.

85.    Upon information and belief, the Hyannis Fire District and other Fire Departments and Fire Districts within Barnstable County used the Barnstable County Fire and Rescue Training Academy ("Fire Academy") for firefighting training exercises using AFFF containing PFOS and/or PFOA manufactured and sold by Defendants.

86.    PFOS and PFOA, individually and/or in combination, have been found in the soil and groundwater under and adjacent to the Property at levels that exceed the EPA's May 19, 2016 health advisory thresholds.

### C.    The Town's Water Supply

87.    In the 1970s, public water supply wells were installed by the Barnstable Water Company proximate to and downgradient of the Property (the "Mary Dunn Wells").

88.    Between the 1970s and 2005, Barnstable Water Company provided drinking water to residents of the Town from the Mary Dunn Wells.

89.    In May 2005, the Town of Barnstable acquired the Barnstable Water Company, including the Mary Dunn Wells.

90.    Upon acquisition of the Barnstable Water Company, the Town contracted with the Connecticut Water Company to continue its management and services operations under the direction of the Town.

91.    The Town's public water system currently consists of 12 well pumping stations, and 107 miles of distribution system.  The Town's water system provides drinking water services to approximately 18,000 residents through approximately 7,249 metered service connections to residential and commercial properties.

### D.    The County's Response Action

92.    In 2010 the Silent Spring Institute published a study of the occurrence of Compounds of Emerging Concern in Cape Cod public water supply wells.  Twenty supply wells

14

were sampled for the study in 2009.  PFOS was found present in samples from the Hyannis public supply wells and distribution system at levels below the then EPA Health Advisory of 0.2 µg/l.

93.    As part of ongoing groundwater sampling program at the Property, groundwater samples collected in November 2013 were tested for PFOS.  PFOS was found present in the Property's groundwater.  Groundwater samples taken downgradient of the Property in June of 2014 also showed the presence of PFOS.

94.    In July 2015, the County activated a pump and treat system to capture a defined high concentration level of PFOS in groundwater.

95.    On August 4, 2016, Massachusetts Department of Environmental Protection ("DEP") issued a Notice of Responsibility ("NOR") to the County, assigning release tracking number ("RTN") 4-2619 to the PFOS release.  The NOR required the County to prepare an Immediate Response Action ("IRA") Plan to perform immediate response actions in response to the release of PFOS to, at and from the Property.

96.    Pursuant to the Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0000, on September 27, 2016 the County submitted an IRA Plan to the DEP.  The IRA Plan includes a description of the investigation conducted as of the date it was filed, provides for further investigation and assessment, evaluates long-term and emergency remedial options and actions to be taken at the site.

97.    The County has committed substantial funds to investigate the sources of the alleged PFOS and PFOA contamination, treat groundwater emanating from the Academy, and to extract and properly treat and/or dispose of all contaminated soils.

98.     The County continues to investigate and take remedial activities arising out of the presence of PFOS and PFOA in the soil and groundwater.

**E.     The Town of Barnstable's Complaint Against the County**

99.     On January 21, 2016, the Town notified the County that the Town's groundwater drinking water supply was contaminated with PFOS which, the Town alleged, was caused by the use of AFFF at the Training Academy located on the County's land.

100.     On July 11, 2016, the Town filed suit against the County in Barnstable County Superior Court (No. 1672CV337) seeking costs and damages in excess of $5 million and equitable relief against the County.

101.     On June 28, 2017, a settlement agreement was entered into between the Town and County.

102.     On June 29, 2017, the Town and County filed an Agreement for Judgment with the Barnstable Superior Court wherein the County agreed to (1) pay $2,950,000 in damages to the Town, and (2) reimburse the Town for its actual future annual operations and maintenance costs for PFASs filtration systems for as long as the Town operates the systems.

103.     On July 19, 2017, the Town and the County filed a stipulation of dismissal with respect to the County's counterclaims and third-party claims.

## COUNT I

### Breach of Implied Warranty of Merchantability – Design Defect

104.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully restated in this cause of action.

105.     At all times relevant herein, Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing and selling AFFF containing PFOS and/or PFOA.  By doing so, Defendants impliedly warranted that AFFF was

merchantable, safe, and fit for ordinary purposes for which it was used, including for fire-fighting training exercises.

106.    It was reasonably foreseeable that the AFFF containing PFOS and/or PFOA that Defendants manufactured and/or distributed and sold would be used on Plaintiff's property.

107.    It was reasonably foreseeable that the AFFF containing PFOS and/or PFOA that Defendants manufactured and/or distributed and sold would contaminate Plaintiff's property and the groundwater under Plaintiff's property and cause damages.

108.    Defendants' AFFF products were manufactured for placement into trade or commerce.

109.    Defendants marketed and sold AFFF for use in controlling and extinguishing aviation, marine, fuel and other shallow spill fires.

110.    As manufacturers, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

111.    By manufacturing and selling AFFF containing PFOA and/or PFOS, Defendants warranted that such AFFF was merchantable, safe and fit for ordinary purposes.

112.    The AFFF as manufactured and/or sold by Defendants reached Plaintiff's property without substantial change in its condition and was used by the Town of Barnstable's Hyannis Fire District and other firefighting training entities in a reasonably foreseeable and intended manner.

113.    The AFFF as manufactured and/or sold by the Defendants was "defective" and "unreasonably dangerous" when it left Defendants' control, entered the stream of commerce, and

was received by the Town of Barnstable and other firefighting training entities because it was dangerous to an extent beyond that which would be contemplated by the ordinary user of AFFF.

114.    The AFFF manufactured and/or sold by the Defendants was defective in design because, even when used as intended and directed by the Defendants, it can result in the contamination of soil and groundwater with PFOS and/or PFOA creating a significant threat to groundwater and drinking water supplies.

115.    The AFFF manufactured and/or sold by the Defendants did not meet a consumer's reasonable expectation as to its safety because of its propensity to contaminate soil and groundwater when used as intended.

116.    Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically feasible, practical and commercially viable, and marketable at the time the Defendants introduced AFFF containing PFOS and/or PFOA into the stream of commerce.

117.    Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically feasible, practical and commercially viable, and marketable at the time the Defendants introduced AFFF containing PFOS and/or PFOA into the stream of commerce.

118.    The specific risk of harm in the form of soil, groundwater and drinking water contamination from AFFF containing PFOS and/or PFOA that the Defendants manufactured and/or sold was reasonably foreseeable or discoverable by Defendants.

119.    PFOS and PFOA are dangerous to an extent beyond that which would be contemplated by the ordinary consumer of AFFF.  This design defect constitutes a breach of the Defendants' implied warranty of merchantability.

120.    The design, formulation, manufacture and/or distribution and sale of AFFF containing PFOS and/or PFOA that were known to be toxic and extremely mobile and persistent in the environment, was unreasonably dangerous.

121.    Defendants' introduction of AFFF containing PFOS and/or PFOA into the stream of commerce was a proximate cause of Plaintiff's property damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and other damages in an amount to be determined at trial.  Defendants are strictly, jointly, and severally liable for all such damages.

## COUNT II

### Breach of Implied Warranty of Merchantability – Failure to Warn

122.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

123.    The use of AFFF on Plaintiff's property for training of fire personnel in the use of AFFF was a reasonably foreseeable use.  Defendants knew or should have known that AFFF used in this manner can contaminate soil and groundwater with PFOS and/or PFOA, creating a significant threat to human health and the environment.

124.    If was foreseeable that PFOS and/or PFOA from the AFFF that Defendants manufactured and sold would enter the soil and groundwater of Plaintiff's Property and would result in the contamination of drinking water supplies that rely upon the groundwater for the source of drinking water.

125.    Defendants had a duty to warn the users of AFFF and Plaintiff of these hazards. Defendants, however, failed to provide adequate warnings of these hazards.

126.    Defendants' failure to issue the proper warnings relating to AFFF containing PFOS and/or PFOA affected the market's acceptance of AFFF containing PFOS and/or PFOA.

127.    Defendants' failure to issue the proper warnings relating to AFFF containing PFOS and/or PFOA prevented the users of the product from treating it differently with respect to its use and environmental cleanup.

128.    Defendants' failure to issue the proper warnings related to AFFF containing PFOS and/or PFOA prevented the users of the product from seeking alternative products, including but not limited to using alternative products for purposes of training in the use of AFFF.

129.    Defendants' action in placing AFFF containing PFOS and/or PFOA into the stream of commerce was a direct and proximate cause of Plaintiff's injury.

130.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff has suffered property damage, requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial.  The Defendants are strictly, jointly, and severally liable for all such damages.

## COUNT III

### Negligence

131.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

132.    Defendants had a duty to Plaintiff to manufacture and/or market, distribute and sell their AFFF in a manner that avoided contamination of the environment and drinking water supplies and avoided harm to those who foreseeably would be injured by the PFOS and/or PFOA contained in Defendants' AFFF.

133.    The use of Defendants' AFFF products at the Fire Academy was a reasonably foreseeable use.  Defendants knew or should have known that its AFFF used in this manner would contaminate soil and groundwater with PFOA and/or PFOS, creating a significant threat

to human health and the environment. Defendants had a duty to prevent the release of PFOS and/or PFOA, in the foreseeable uses of AFFF.

134.     Defendants breached their duties when they negligently manufactured a dangerous product (AFFF), negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil and groundwater.

135.     As a direct and proximate result of Defendants' breaches of their duties, Defendants caused Plaintiff to suffer actual losses. Specifically, Plaintiff suffered property damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

**COUNT IV**

**Indemnification for the Town's Litigation Against the County**

136.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

137.     Defendants knew or should have known that AFFF used in this manner can contaminate soil and groundwater with PFOS and/or PFOA, creating a significant threat to human health and the environment, include public water supplies.

138.     On January 21, 2016, the Town notified the County that the Town's groundwater drinking water supply was contaminated with PFOS which, the Town alleged, was caused by the use of AFFF at Plaintiff's Academy.

139.     On July 11, 2016, the Town filed suit against the County in Barnstable County Superior Court (No. 1672CV337) seeking costs and damages in excess of $5 million and equitable relief against the County.

140.    On June 28, 2017, a settlement agreement was entered between the Town and County.

141.    On June 29, 2017, the Town and County filed an Agreement for Judgment with the Barnstable Superior Court wherein the County agreed to (1) pay $2,950,000 in damages to the Town, and (2) reimburse the Town for its actual future annual operations and maintenance costs for PFASs filtration systems for as long as the Town operates the systems.

142.    On July 19, 2017, the Town and the County filed a stipulation of dismissal with respect to the County's counterclaims and third-party claims.

143.    The County is entitled to indemnification from Defendants for its costs and damages relating to the Town's lawsuit against the County.

## COUNT V

## G.L. c. 21E § 4 - Contribution[1]

144.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

145.    Defendants are persons liable pursuant to G.L. c. 21E § 5 for releases or threats of releases at and from the Property for which Plaintiff has suffered response action costs and damages.

146.    G.L. c. 21E § (5)(a)(5) provides that "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault."

_____

[1] On January 18, 2018, Plaintiff sent each Defendant named in this lawsuit a § 4A notice letter via certified mail, return receipt requested.  Plaintiff recognizes that G.L. c. 21E § 4A requires that notice be given prior to the commencement of a contribution claim.  However, because of the Court's January 18, 2018 deadline to amend Plaintiff's Complaint, it was not possible for Plaintiff to comply with both the notice requirements of § 4A and the Court's deadline to file the Amended Complaint.  Plaintiff will agree if requested to extend Defendants' time to respond to Plaintiff's First Amended Complaint until after the expiration of the applicable § 4A time period.

147.     On information and belief, Defendants directly or indirectly arranged for the disposal of hazardous material to or in a site or vessel from or at which there is or has been a release or threat of release of hazardous material that has resulted in the contamination of the soil and groundwater on and adjacent to the Property.

148.     On information and belief, the Defendants otherwise caused or are legally responsible for a release or threat of release of hazardous material from a vessel or site that has resulted in the contamination of the soil and groundwater on and adjacent to the Property.

149.     Defendants designed, marketed, sold and/or directly or indirectly transported AFFF that was used on Plaintiff's property.

150.     AFFF containing PFOS and/or PFOA was released on the Property as a result of Defendants' actions and/or inactions.

151.     As such, Defendants are persons who otherwise caused or are legally responsible for a release or threat of release of a hazardous material at the Property, and as such, are liable for those releases pursuant to G.L. c. 21E § (5)(a)(5).

152.     Plaintiff is entitled to contribution from Defendants for their equitable share of response costs incurred in response to the release or threat of release of hazardous material pursuant to G.L. c. 21E § 4.

## COUNT VI

### G.L. c. 231B – Contribution for the County's Costs and Damages

153.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs of as if fully set forth herein.

154.     Defendants knew or should have known that AFFF used for its intended purpose would contaminate soil and groundwater with PFOA and/or PFOS, creating a significant threat to human health and the environment, including public water supplies.

155.    The County has suffered damages in addition to 21E response costs, including but not limited to, damages relating to the State Court Action, in an amount to be determined at trial, and therefore, the County is entitled to contribution from the Defendants for such costs damages pursuant G.L. c. 231B, § 1.

## COUNT VII

### Declaratory Judgment

156.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

157.    There is an actual and present controversy between the parties as to Defendants' liabilities and responsibilities for contamination at the Property.  The Court should resolve this controversy by means of its equitable power to enter declaratory judgment pursuant to the provisions of G.L. c. 231A, § 1.

158.    Plaintiff requests a Judgment declaring that Defendants are liable for Plaintiff's past and future response costs and damage to real and personal property arising out of the AFFF contamination to, at and from the Property.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Enter judgment in its favor and against Defendants on each Count of this Amended Complaint;

B.    An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, and monitoring costs incurred by Plaintiff, or for which Plaintiff is or was legally responsible, to comply with the EPA's public health advisories and the Commonwealth's soil and groundwater cleanup standards;

C.    An order that Defendants contribute their equitable share of damages incurred by Plaintiff as a result of the Town's lawsuit against the County;

D.    An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

E.    An award for treble and punitive damages; and

F.    An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

BARNSTABLE COUNTY,
By Their Attorneys,

*/s/ Robert D. Cox, Jr.*
Robert D. Cox, Jr. (BBO #546486)
Jennifer L. Garner (BBO #688754)
BOWDITCH & DEWEY, LLP
311 Main Street, Post Office Box 15156
Worcester, MA  01615-0156
T 508.926.3409
F 508.929.3012
E rcox@bowditch.com
  jgarner@bowditch.com

Richard W. Head (NH Bar #7900)
Of Counsel
*(appearing pro hac vice)*
SL ENVIRONMENTAL LAW GROUP PC
450 Mission Street, Suite 400
San Francisco, CA 94105
T 415.348.8300
F 415.384.8333
E rhead@slenvironment.com

Kevin J. Madonna
*(appearing pro hac vice)*
Robert F. Kennedy, Jr.
*(appearing pro hac vice )*
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road
Hurley, NY 12443
T 845.481.2622
F 845.230.3111
E kmadonna@kennedymadonna.com
    rkennedy@kennedymadonna.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF system on this 8th day of February, 2018, and was thus served automatically upon all counsel of record for this matter.

/s/ *Richard W. Head*
Richard W. Head